May it please the court, my name is Scott Medlock. I am counsel for the for the appellants plaintiffs below the surviving family of Jason Hyatt. Jason Hyatt was the third man in three years to take his own life in the Callahan County Jail in Texas. The district court erred because no reasonable officer would leave a detainee with multiple suicidal indicators in a cell with bedding and a trash bag where observation was impossible knowing that three of the two other men had taken their own lives in the recent past at the jail. Defendant appellant Brianna Thomas's actions weren't just unreasonable. Where is this jail? I'm sorry? Where is it? It's near Abilene. It's near Abilene, but in West Texas that covers a lot of territory. It's very near Abilene. I believe it's one of the Does the record show that Officer Thomas had a duty to inspect the cells to be sure they were clear of things that could be used for suicide? Absolutely, Your Honor. She was the officer who booked Mr. Hyatt into the jail. She was the one who issued him the property that he would have had in the cell. She would have been the one who was in charge of making sure that the cell was suitable for him when she placed him in it. How large of a facility is this? It has an average population of six inmates a day, which makes the suicide rate at the facility astronomical. I believe they have a maximum capacity of around ten inmates per day, so it's a very small facility. I have a question from Justice Clement. In your brief at page six, you say that Thomas issued the garbage bag to Hyatt. Did she actually issue it to him, or was it already in the cell, or is that unknown? If he had it in the cell, he should have gotten it from Thomas. We most favorably to the appellee, which of course is not the standard. It may be possible that the bag was in there beforehand, but we believe that she was the one who issued him everything that was in the cell because that was her job. It was her job to make sure whatever property was in the cell was appropriate to be there when she actually placed him in the cell. Tell me a little bit about what this bag was. Someone hangs themselves with a bag. That strikes me. What kind of bag are we talking about? It's a plastic trash bag, Your Honor. We didn't include the actual photos of the bag. How large is it? It would be like a bag that you would get from like a takeout place that you're carrying your food home in, or a small bag that you might get from like a Walgreens or a CVS that they bag your groceries, a small plastic bag that could be used to line a trash can. That's the type of bag that we're talking about. It's actually not as uncommon an implement for suicide in jails as you might think. There's multiple reported decisions, which we've cited in the brief, where the same type of bag has been used by inmates to hang themselves. And I think that focusing on the bag to some extent is a red herring, because she left him with plenty of other suicide implements in the cell as well. We have included some of the other photos in the record, which is pages 178 through 181 of the record, where you can see everything that she did leave him in the cell with, which includes the towel, the blanket, the mattress cover, which one of the previous inmates had used to commit suicide. There were a plethora of objects in there, and she shouldn't be rewarded kind of for Mr. Hyatt's creativity in using the bag, when he had plenty of other implements that she left him with as well. There was a camera coverage of the of the cell itself, but it was incomplete? That's the critical part, Your Honor, is that the camera only covered a portion of the cell. There's a restroom area in the back of the cell where there was no video coverage, and of course that's the part where Mr. Hyatt actually hung himself. And moreover, the video camera coverage in the other cells was where the other two men had killed themselves, was also present, and failed to prevent those suicides. And in fact, when the Texas Department of Public Safety, the Texas Rangers, investigated those previous suicides, they specifically noted that the video camera coverage was inadequate, because the quality of the video was very low, and because the bar, this is a, the, you'll see from the photos, the bars in the cell are a traditional, you know, like what you'd think of in a Mayberry type jail. The bars run up and down, as the ligature would also run up and down, so on the low quality video, it was very hard to see that that's what was going on. Judge Clement asked, would, would it be customary to have video of the toilet area? I, I think that varies between, between facilities, Your Honor. There's some, I mean, obviously once you're in jail, your expectation of privacy is very low, and in particular, a case where you know an inmate is suicidal, that's not a cell that would be appropriate where there's a blind spot in camera coverage. This is an issue that was specifically addressed by this court in the Jacobs versus West Philistiana Sheriff's Department case, where there was also a blind spot in the camera coverage at issue. If that's the way the jail is set up, they have two alternatives. They can either put him in a cell where that's not the situation, or they can have a, an officer very frequently, if not constantly, observing him to make sure that that doesn't happen. Those are the options that would be reasonable in that situation, and neither of those options were pursued here. In fact, even, Thomas didn't even follow the, what, the inadequate policy that the Callahan County Jail had. The jail said that when an inmate may be suicidal, and I believe it's page 284 in the record is the policy, it's about two sentences and says when there is an inmate who is suicidal, you need to start a, quote, close watch on the inmate. Close watch is not defined, so Thomas is not given a lot of guidance there, but we know it was not a close watch because he was only watched, he was only observed once an hour, which is the, the log records show is the same frequency as every other inmate in the jail. So there's no evidence that anything was, that, I mean, that's the most obvious proof that her actions were objectively unreasonable. She didn't even follow the inadequate policy that Callahan County had at the time. Where was, where was her, her office or desk or whatever in relationship to the cell block in this particular cell? That we also don't know at this time, Your Honor, but I, I think the evidence would show on remand that it was not adjacent to the cell or a place where they could directly observe it. There's some discussion between the other officers who were there the morning when Mr. Hyatt hung himself that I'm busy doing the dispatch duties, which Thomas would have also been done, hey, can you go look and see what's going on with Hyatt? I can't see him on the video anymore. So that would tend to show that wherever her office was, she couldn't see directly into the cell at all times. I'm trying to picture that. A lot of these small Texas towns have a jail and they're, they are, the question of, it may not, may or may not be a walkway in front of the cells themselves, but just help me a little bit. It may be in the record and I can look at it there, but so I'm trying to visualize how one would monitor those cells other than by a camera. Well, the, the, what should have been done in this situation is either you can place him in the cell that is closest to where the dispatcher is, which I, I don't believe it's in the record. The layout of the jail, I think we have that, but I don't think that it's in evidence. So I apologize for that, Your Honor. But I believe that the, the two ways that they could handle this are put him the way, the closest to the, the dispatch as you can, where you know there's going to be someone, or you call someone in to keep an eye on Mr. Hyatt until you can actually get him to see a mental health professional to assess him or, or until he bails out the next morning, which is what would have happened. Unfortunately, Mrs. Hyatt actually arrived at the jail intending to bail her husband out only to find that he'd hung himself. Judge Clement asked this question. Thomas finished her shift at 9 p.m. and she briefed her replacement before she left. The suicide did not occur until 7 a.m. the next morning. Would you argue that the causal chain is broken at that point? No, Your Honor. I believe there's, Thomas had the best clear chance to prevent the suicide and had multiple layers of responsibility that she didn't follow. She didn't actually, she told her replacement to keep an eye on him, but there's no indication in the record that she kind of conveyed all of the, the indications that he might be suicidal to her replacement. In addition, he didn't kill himself during her replacement's tenure, you know, time at the shift either. He killed himself after her replacement had left. That's important and puts the blame on Thomas, because she should have started the suicide watch, which then all subsequent officers would have followed. Based on this record, though, can we reasonably infer that she was deliberately indifferent in causing the suicide or failing to prevent the suicide? Absolutely, Your Honor. Deliberate indifference requires that she have the subjective awareness that he's a risk for suicide, which we know from the, we have that from the suicide questionnaire that she completed with him, which has multiple indices, and we know it from her own actions and that she subjectively drew that inference because she refused, she didn't issue him the one piece of, the, like, most obvious piece of dangerous material, which was the thin sheet, which one of the other inmates had used to hang himself with. So we knew that she had the subjective awareness of the risk and that she actually drew the inference. As for the second prong of deliberate indifference. That means we would have to find on this record that she actually knew about the Well, I guess, wouldn't we almost have to do that in this case? I don't think that's correct, Your Honor, because I think that we know, if she'd left, she left him with a lot of other material that he could have used that was obvious in the cell. We don't know, because we only have the after the fact photos. She withdrew some materials that an inmate would normally have. The hygiene materials and the thin sheet, whatever that is. The thin sheet would be the, you know, they think the difference between a sheet and a blanket. She gave him the blanket, but not the sheet. That's the only real step that she took. We don't know what these hygiene items are, but we do know that she had left him with the blanket, the mattress cover, the jail uniform, which is frequently used. And all these items are also things that The records show that Mr. Hyatt had torn or dismantled this bag, this garbage bag or whatever it was. I don't believe, I don't think that's in the record, Your Honor. It's a small bag, so I don't believe he would have had to rip it into pieces or anything. I think he could just wrap it around and that's how he ended up using it. That's what the photos that aren't in the record indicate, anyway. Is there only one person, how many personnel are in the jail? Employees? I believe it's one or two. In the morning shift, there were two. It appears that there was one overnight. That was Mr. Turner, who was also dismissed. If there are two in there, what are their jobs? What are they doing? I think that the one person, their job is principally being the dispatcher and handling the booking in, and the other is more doing what you'd think of traditional correctional officer roles. I'm sure opposing counsel can clarify that. I think the record is clear that there was only one person there overnight, though, that the night shift is essentially one person. Thomas left at the end of the day, as Judge Clement pointed out, the evening before Mr. Hyatt killed himself the next morning, so there had actually been two shift changes by then. That's why starting the suicide watch and initially putting him in the appropriate cell is so important, and that's why Thomas' actions were deliberately indifferent, and I'll save the rest of my time for rebuttal. Thank you, sir. Mr. Self? Thank you, Your Honor. Police, court, counsel, my name is Charlotte Self, and I'm here today representing Breanna Thomas. There's been a couple or a couple of issues raised in counsel's argument that I feel like I need to address right off the bat. The facility is roughly about a two-story small country jail, for lack of a better term. I don't know the population of Callahan County, Texas. It's rather small. It's a bedroom county, for lack of a better term, of Abilene, probably about 10 to 15 miles away. It's a small old facility. As to the staffing of the jail, the jail was adequately staffed pursuant to Texas jail regulations and was adequately staffed all night, and as the court has already focused upon, this suicide occurred that following morning, long after Ms. Thomas had left, and I'm not up here making an excuse to dismiss you from the claim. I understand that's not determinative necessarily, but the facts of this case are slightly different than what counsel may have represented, and I don't mean to imply he's intentionally misrepresenting. We differ on the facts. Mr. Hyatt was arrested the evening, I believe. He was brought to the Callahan County Jail. He was booked in by Ms. Thomas, and at that time, as happens throughout most jails or county jails in Texas, he was administered a series of questions, a medical intake, psychological intake, for lack of a better term, questionnaire. In fact, I think I've been here in front of at least this judge on a similar issue involving that exact same questionnaire, and one of those questions is, have you ever attempted suicide? And his answer was, yes, I did in August, which was approximately four months prior to this. Immediately after that question, she asked, are you contemplating suicide right now? His answer was no. There's also evidence in this record, I believe, which we touch on later in the brief. At the time he was being booked in, he was laughing, he was joking, he was joking with Officer De La Garza, the DPS officer who arrested him. In spite of this, in his response, he said, no, I'm not contemplating suicide. She did take some steps. She did not issue the thin sheet, and the thin sheet that we've talked about is, my understanding, a bed sheet, the cover you would put on between the blanket and you, because obviously that's an easy thing to use to fashion into a hygiene kit. My understanding from the hygiene kit, and I'm not trying to get outside of the record, but my understanding from the hygiene kit is one of the things that would be in that hygiene kit would be a razor. I'm a little shocked by some of the evidence that we've discussed today, because it's my understanding from the record, it's clear this bag was, the only example I can give is the main supermarket, and that's where I shop, and you can go to my house today and look in the trash bags, or the trash cans out in my house, and they'll have these plastic United Supermarket bags. It's the same kind of bag you'd get when you go to, I don't know what the chain is here in New Orleans, but it's that. We're not talking about a glad 50-gallon trash bag. We're talking about a bag you'd get to from the grocery store, from Chinese food, wherever it would be, and I don't recall any evidence or even an issue as to Ms. Thomas issuing this bag. This bag was not issued by Ms. Thomas. I've not seen any evidence to that. I've not seen that in her affidavit. I've not seen that in the affidavit of the other three individual defendants in this case who also moved for and were granted judgment based upon qualified immunity. The appellant has focused solely on Ms. Thomas because Ms. Thomas booked him in, and the appellant's argument is, as best I can I think the cases are clear that, in fact, it's Hare maybe versus City of Corinth. It's obvious you have to do something. I'm not trying to lessen this, but you can't put an inmate in a jail and hand him a rope. You can't put an inmate in a jail and how far do you have to go? Did she do something? Is there evidence in this record that Ms. Thomas did take steps to prevent this? Yes, she did. She put him in a cell that had surveillance. Did it have 100% surveillance? No, it didn't have surveillance of the bathroom. Did she issue him the thin sheet, the hygiene items? No, she wasn't going to give him that. Did she take steps? Did she inform deputies, keep an eye on this man? Yes, she did. So the question gets back to, is she deliberately indifferent? Does she know that this guy is a huge suicide risk and all likelihood is going to do it and I'm going to give him the implements to do that. I'm going to make them available. No, she didn't. We don't have deliberate indifference here. I feel for the family of Mr. Hyde. I know how devastating this is, but the law is she has to be deliberately indifferent and it's a high standard. In fact, this court just three weeks ago, the opinion written by Judge Clement, it's a very hard burden to overcome and in this case, there is evidence of the steps that she took. Were they perfect? Absolutely not. If they were, we wouldn't be here, but as this court knows, as this each cell had video and whether there was no other cell that had more video coverage or anything like that. My understanding, your honor, is this is the only cell at that jail that has video coverage for the male population. That's my understanding. In answer to your question, I don't know if it's in the record as to the layouts of these cells and how many and we're talking maybe two cells. At best, maybe three cells. I mean, this jail fits in this courtroom with room left over for a front yard. Let's put it that way. My point being, she put him in, my understanding is, the only cell that had video coverage. And what does the record show? She had a duty to inspect the cell before someone was placed in it to be sure it was clear of garbage bags and things like that? No, sir. I heard that argument made by the appellant, but I didn't recall anything in the record that she had that duty. I mean, she was, she's a dispatcher and a sheriff's deputy. And as you maybe probably can guess, it's a small county. You have deputies that do multiple things. Dispatcher is going to sit there and take calls, dispatch deputies, check the jail. I think they even cook breakfast or maybe cook all meals. In reference to this, we don't have Aunt Bea showing up. Somebody there actually has to do it. But she didn't issue, she didn't put the bag there. The bag apparently goes with the cell. Yes, sir. I doubt seriously it goes with the cell today, but at the time, it just made it easier to pick up the trash for commissary food, whatever they wanted to throw in there. I understand that. I've been yelled at a time or two not for putting them in myself. Not at the jail, but at home. I think the evidence is clear that she did not put this in. She did not know it was there. And I don't think ever contemplated that this could be done. I can assure you that jail, other jails all over that part of the country, probably in the entire state, they're not doing this anymore. So saying about, you know, bad judgment, bad decisions, bad experiences make good judgment. So we had a bad experience. What do they do about shoelaces? I don't believe he had them. My understanding is, I don't think he was, my understanding, and I'm not trying to get outside the record, my understanding is he doesn't have his shoes. I think he's given those. Slippers? Yes, sir. For a couple reasons. Number one, you can't, there's no shoelaces. Number two, you can't run in them. If there aren't any questions, I'll yield my time. All right. Thank you, sir. Thank y'all. Mr. Medlock, you have five minutes on rebuttal. I'd like to take just a quick moment to point y'all to some of the evidence that you were just discussing with Mr. Self. The shoelace, he was, Mr. Hyatt was taken out of his civilian clothes and put in a jail uniform. You can see that in the photos of his cell. You can actually see the shower shoes or the Crocs or whatever they were in the cell photos as well. So we know that they did take his shoelaces away. The problem there is that they did also give him the uniform itself, which is frequently used as the actual suicidal implement. The practice that you should follow is if you're not going to strictly observe someone, you need to take everything that's possible out of the cell and typically give them a paper gown or what's called a suicide smock, which is a tear-resistant gown. The record also shows that it wasn't the only cell that had video coverage. And we know that because if you look at the DPS reports from Mr. Higgins and Mr. Nass's suicides, those were actually in different cells and also discuss the problems with the video surveillance. Mr. Nass's, the DPS report on Mr. Nass's suicide is at 226 in the record and Mr. Higgins' is at 244. The two issues I'd like to use the remainder of my time to discuss are that Mr. Hyatt said no to the one question on the questionnaire and the question of did Ms. Thomas do enough. I think that the question of Mr. Hyatt did say no to that one question, if that's the question, then the rest of the questionnaire is useless. There would be no purpose for having the rest of it. The district court ignored the expert report of our psychologist, Dr. Keith Curry, who is an expert in suicide prevention in jails and explains why you can't just have that one question be dispositive. I think the amicus brief of the Texas Civil Rights Project also illustrates why you can't just let that one question make or break your decisions. The amicus points out that if an inmate is truly suicidal, if they want to go through with it, then they are likely to lie on that one question. The other questions on the questionnaire are to raise objective red flags like have you thought about killing yourself in the past, have you attempted suicide in the past, questions you're more likely to get a frank answer on. The question of didn't Ms. Thomas just do enough. This court had said in the Jacobs case that taking some preventative measures is not enough when the overall conduct of the deputy was objectively unreasonable. And here we know that Thomas' conduct was objectively unreasonable. Does that present a fact issue? The position of the procedural posture of Jacobs is identical to where we are here. In Jacobs, the officers had moved for summary judgment and the court said, you know, there's at least a fact issue as to whether their conduct was appropriate and remanded it back for trial. That's exactly the same result that the court should reach here. There's at a minimum a fact issue as to what Thomas actually did. I think opposing counsel recognized that we actually disagree on some of what the facts are. I do agree with his description of the trash bag, however. That's what we're talking about. The Jacobs case is illustrative because of the thing, even things . . . But part of the immunity is immunity from trial itself. So the threshold for fact issues has to be framed very carefully. That is, you'd have to conclude that a reasonable juror could conclude on the fact of this case that she was deliberately indifferent. So we have to make that threshold question. Is that the issue, as you see it, that this court has to make? That's absolutely right, Your Honor. I mean, the issue should be resolved in favor of Mr. Hyatt's family because of the context and the overall conduct of what Thomas did. She took one preventative measure, didn't give him the thin sheet. She ignored every other possible implement in the cell. She didn't follow her training from the Commission on Law Enforcement, which instructed that video camera surveillance was deficient. She didn't follow the inadequate policy that was in place at the time in Callahan County, and she didn't exercise common sense in just looking at the cell and seeing all the . . . What is the obligation of the successive officers who follow the other shifts? What's their obligation when they come on shift? Well, I think that it's hard to say what obligation the officers in the morning had other than to treat Mr. Hyatt like another inmate because apparently they were never told anything about Mr. Hyatt being at a suicide risk. And that's why Thomas's failure to start a suicide watch is so significant. As for the officer who was there during the night shift, I think it's . . . I thought that the state standard imposed an obligation on the . . . on later . . . it was a continuing obligation, so that when the handoff was made, that they knew that each successive officer knew that there was a suicide risk in that cell. And that's why you'd want to start a formal suicide watch, Your Honor, so that there's a piece of paper that says, we're checking on you this frequently because we're concerned about suicide. Here, it looks like informally Thomas told her successor, I have some concerns about this guy, but didn't start a formal watch. And then when the night passed uneventfully, the morning shift wasn't informed by the night shift. But she made the handoff, though. She did. She told the successor of that. Why doesn't That circumstance itself should play on the determination of whether or not she acted with deliberate indifference. Well, again, I think you have to . . . But it's not just one thing she did. She did a number of things. Well, she did . . . giving her all the benefits of the doubt, she took away the thin sheet and she told her successor. Those are similar to the actions that were taken by the officer who was denied qualified immunity in the Jacobs case, where he did start a suicide watch, but then didn't . . . was in the overall context of his actions was indifferent. What I'm trying to highlight is that officer number two that she informed would have seemed to have had the continuing duty, the same duty she had. Yes. He would have had the same obligations to make sure that the cell was clear of hazards and to observe Mr. Hyatt and then to tell his successors about the risk. And we know he didn't tell his successors about the risk, and he also didn't keep the cell clear. But those are the same failures that Thomas had. So I think that she can . . . She told her successor that he was at risk. True. She did two things most charitably to her. She took the most obvious implement away and then she told her successor that she had some concerns without starting a formal suicide watch, which would have informed all subsequent officers until the watch was discontinued. And that's the overall conduct that indicates that Thomas was deliberately indifferent here. If there are no other questions, I think I'm out of time. Thank you very much, sir. Thank you, Your Honors. That concludes our orally argued cases for today. Court will adjourn until 9 o'clock tomorrow morning.